| | | |
|---|---|---|
| YUHE DIAMBA WEMBI, | ) | |
| | ) | |
| Plaintiff, | ) | 14 C 10407 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| METRO AIR SERVICE, | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| YUHE D. WEMBI, | ) | |
| | ) | 15 C 464 |
| Plaintiff, | ) | |
| | ) | Judge Gary Feinerman |
| vs. | ) | |
| | ) | |
| METRO AIR SERVICE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

In December 2014, Yuhe Wembi brought Case 14 C 10407 against Metro Air Service,

his then-employer, alleging race and color discrimination in violation of 42 U.S.C. § 1981 and

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and age discrimination in

violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et

seq.* Doc. 9 (14 C 10407). In January 2015, after Metro fired him, Wembi brought Case 15 C

464, alleging discrimination and retaliation in violation of § 1981 and Title VII. Doc. 9 (15 C

464). Metro has moved for summary judgment on all claims. Doc. 38 (14 C 10407); Doc. 40

(15 C 464). In Case 14 C 10407, the motion is denied as to Wembi's failure to promote claim

and granted as to all other claims. In Case 15 C 464, the motion is denied as to Wembi's

retaliatory termination claim as it pertains to his filing of Case 14 C 10407 and granted as to all other claims.

## Background

Consistent with the local rules, Metro filed a Local Rule 56.1(a)(3) statement of undisputed facts along with its summary judgment motion in each case. Doc. 40 (14 C 10407); Doc. 42 (15 C 464). All but one of the factual assertions in the Local Rule 56.1(a)(3) statements cite evidentiary material in the record and are supported by the cited material. *See* N.D. Ill. L.R. 56.1(a) ("The statement referred to in (3) shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph."). The exception is a statement of negation, asserting that Wembi has not adduced evidence or testimony to establish certain facts, Doc. 40 (14 C 10407) at ¶ 28, and so that statement could not be supported by specific record citations. Also consistent with the local rules, Metro in each case filed and served on Wembi a Local Rule 56.2 Notice, which explains in detail the requirements of Local Rule 56.1. Doc. 41 (14 C 10407); Doc. 43 (15 C 464); *see Ohio Nat'l Life Assurance Corp. v. Davis*, 803 F.3d 904, 906 (7th Cir. 2015) ("Local Rule 56.2 … requires a party moving for summary judgment against a *pro se* litigant to inform his opponent of the procedures for complying with Fed R. Civ. P. 56.").

Despite receiving an additional four weeks to respond to Metro's summary judgment motions, Doc. 46 (14 C 10407); Doc. 48 (15 C 464), Wembi did not file a Local Rule 56.1(b)(3)(B) response to either of Metro's Local Rule 56.1(a)(3) statements; nor did he file a Local Rule 56.1(b)(3)(C) statement of additional facts. Instead, his response consists primarily of documents that Metro had filed as part of its summary judgment motions, including Wembi's

interrogatory answers, Metro's discovery requests, several affidavits, deposition transcripts, and Metro's Local Rule 56.1(a)(3) statements. Doc. 47 (14 C 10407). Although Wembi numbered parts of his response to correspond to some of Metro's Local Rule 56.1(a)(3) assertions from Case 15 C 464, neither his responses to those assertions, *id*. at 4, nor his numbered responses to specific paragraphs in certain affidavits that Metro filed with its summary judgment motions, *id*. at 16, cite any record material or supporting declarations or affidavits. Wembi did not offer numbered responses to Metro's Local Rule 56.1(a)(3) statement from Case 14 C 10407, but instead made several arguments regarding his beliefs about certain facts in the case. *Id*. at 38. Wembi's response violates Local Rule 56.1(b)(3)(B), which requires the non-movant to file "a response to each numbered paragraph in the moving party's statement, including in the case of any disagreement, specific reference to the affidavits, parts of the record, and other supporting materials relied upon." N.D. Ill. L.R. 56.1(b)(3)(B). Wembi's response to Metro's affidavits is non-compliant for the additional reason that Local Rule 56.1(b)(3)(B) requires responses "to each numbered paragraph in the moving party's [Local Rule 56.1(a)(3)] statement," not directly to the record material that supports those paragraphs. *Ibid*.

In a filing after the summary judgment motions were fully briefed, Wembi makes several arguments to excuse his non-compliance with local rules. He contends that he "can't [c]ite facts because [Metro] refuses to provide requested documents"; that the "[l]ocal rule doesn't mention numbering paragraphs"; that he "state[s] personal knowledge based off what he was told by [Metro] and what he experienced while working there"; that he did not attach record material to his response because he requested that the court ask Metro "to bring documents to court to support [Wembi's] evidence"; and that he "has provided evidence since [the beginning] of the case although his evidence is []being used against him." Doc. 53 (15 C 464) at 1.

These arguments are unpersuasive. Discovery began in May 2015, Doc. 21 (15 C 464), and closed prior to November 3, 2015, Doc. 37 (15 C 464), so Wembi had ample time to alert the court to Metro's alleged failure to produce documents. The local rules clearly require numbered paragraphs, *see* N.D. Ill. L.R. 56.1(b)(3)(A) ("numbered paragraphs"); N.D. Ill. L.R. 56.1(b)(3)(B) ("each numbered paragraph"); N.D. Ill. L.R. 56.1(b)(3)(C) ("short numbered paragraphs"), and also require the non-movant to support its response with "specific references to the affidavits, parts of the record, and other supporting materials relied upon" rather than non-record or non-affidavit assertions of personal knowledge. N.D. Ill. L.R. 56.1(b)(3)(B). Nothing in the local rules, moreover, prevents a litigant's evidence from being used against him.

The Seventh Circuit "has consistently upheld district judges' discretion to require strict compliance with Local Rule 56.1." *Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015) (citing cases); *see also Stevo v. Frasor*, 662 F.3d 880, 886-87 (7th Cir. 2011) ("Because of the high volume of summary judgment motions and the benefits of clear presentation of relevant evidence and law, we have repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings."); *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) ("Because of the important function local rules like Rule 56.1 serve in organizing the evidence and identifying disputed facts, we have consistently upheld the district court's discretion to require strict compliance with those rules.") (internal quotation marks omitted). Whether they seek or oppose summary judgment, parties have a right to expect that Local Rule 56.1 will be enforced and that facts not properly presented under the rule will be disregarded. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015) ("The purpose of Rule 56.1 is to have the litigants present to the district court a clear, concise list of material facts that are central to the summary judgment

determination.  It is the litigants' duty to clearly identify material facts in dispute and provide the admissible evidence that tends to prove or disprove the proffered fact.  A litigant who denies a material fact is required to provide the admissible evidence that supports his denial in a clear, concise, and obvious fashion, for quick reference of the court.  The district court did not abuse its discretion in finding Curtis failed to comply with Rule 56.1 requirements.").  Wembi's status as a *pro se* litigant does not excuse his non-compliance with the rule.  *See McNeil v. United States,* 508 U.S. 106, 113 (1993) ( "[W]e have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Maddox v. State Auto Prop. & Cas. Ins. Co.*, 638 F. App'x 533, 534 (7th Cir. 2016) ("[A] district court is entitled to enforce its local rules, even against *pro se* litigants."); *Whitmore v. Boelter Brands*, 576 F. App'x 609, 610 (7th Cir. 2014) ("[A]lthough we liberally construe the filings of *pro se* plaintiffs, district courts may require *pro se* litigants to comply strictly with local rules."); *Wilson v. Kautex, Inc.*, 371 F. App'x 663, 664 (7th Cir. 2010) ("[S]trictly enforcing Local Rule 56.1 was well within the district court's discretion, even though Wilson is a *pro se* litigant.") (citation omitted); *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006) ("[E]ven *pro se* litigants must follow rules of civil procedure.").  Accordingly, the court accepts as true the facts set forth in Metro's Local Rule 56.1(a)(3) statements in both cases.  *See Curtis*, 807 F.3d at 218 ("When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion.") (internal quotation  marks omitted); *Parra v. Neal*, 614 F.3d 635, 636 (7th Cir. 2010); *Rao v. BP Prods. N. Am., Inc.*, 589 F.3d 389, 393 (7th Cir. 2009); *Cady*, 467 F.3d at 1061; *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006).

That said, the court is mindful that "a nonmovant's failure to ... comply with Local Rule 56.1 … does not … automatically result in judgment for the movant," which "must still demonstrate that it is entitled to judgment as a matter of law." *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012). The court therefore will recite the facts in Metro's Local Rule 56.1(a)(3) statements and then determine whether, on those facts, it is entitled to summary judgment. The court sets forth the following facts as favorably to Wembi, the non-movant, as the record and Local Rule 56.1 allow. *See Woods v. City of Berwyn*, 803 F.3d 865, 867 (7th Cir. 2015). In considering Metro's summary judgment motions, the court must assume the truth of those facts, but does not vouch for them. *See Arroyo v. Volvo Grp. N. Am.*, 805 F.3d 278, 281 (7th Cir. 2015). Because Case 14 C 10407 provides much of the background for Case 15 C 464, both cases involve related "questions of fact," and "considerations of judicial economy strongly favor simultaneous resolution of all claims growing out of one event," *Ikerd v. Lapworth*, 435 F.2d 197, 204 (7th Cir. 1970), the court discusses the facts of both cases together.

Metro handles the transfer of bulk freight items at a facility near O'Hare International Airport. Doc. 42 (15 C 464) at ¶ 3. Metro hired Wembi on November 16, 2011, as a mail handler, and he remained continuously employed until his termination on January 5, 2015. Doc. 40 (14 C 10407) at ¶ 1; Doc. 42 (15 C 464) at ¶ 1. At Metro, mail handlers work the hours necessary to meet the demands of the business; some of the factors that determine these demands, such as weather, traffic delays, and the awarding of contracts, are outside of the company's control. Doc. 40 (14 C 10407) at ¶ 4; Doc. 42 (15 C 464) at ¶ 5. Mail handlers do not have guaranteed hours, and seniority is not a factor in their scheduling. Doc. 40 (14 C 10407) at ¶ 4. Wembi's duties involved unloading trucks arriving from the East Coast and distributing mail bundles to different containers for shipment elsewhere, and his work hours

varied with the needs of the business throughout his entire employment with Metro. Doc. 42 (15 C 464) at ¶¶ 5-6.

Wembi initially worked between six and eight hours per week. Doc. 40 (14 C 10407) at ¶ 2. In August 2012, Metro entered into a new contract with the U.S. Postal Service ("USPS"). *Id*. at ¶ 4. Because the USPS contract was a new engagement, Metro management was unsure of how to staff it and how many workers and work hours were required to perform it. *Ibid*. Thomas Ziebell, Wembi's supervisor, approached Wembi in August 2012 and offered him the opportunity to work additional hours on the shift associated with work on the USPS contract. *Id*. at ¶¶ 4-5. Wembi accepted and began working up to forty hours per week, although no workers on the shift were guaranteed a certain number of hours. *Id*. at ¶¶ 2, 5-6; Doc. 42 (15 C 464) at ¶ 4.

On December 17, 2012, Wembi filed a charge with the Illinois Department of Human Rights ("IDHR"), alleging that his hours were reduced on November 4, 2012, on account of his race, which is African-American. Doc. 40 (14 C 10407) at ¶ 7; Doc. 40-4 (14 C 10407); Doc. 42 (15 C 464) at ¶ 8; Doc. 42-5 (15 C 464). The charge, which did not allege age discrimination, Doc. 40-4 (14 C 10407) at 2; Doc. 42-5 (15 C 464) at 2, alleged that Wembi's hours had been reduced from forty to nineteen per week. Doc. 40 (14 C 10407) at ¶ 8. In an interrogatory response, Wembi indicated that he believed that Metro hired three new full-time employees, two white (Aljazi Zaid and Eluedin Tatarevic) and one Latino (John Paul Vargas), who worked 32-40 hours per week as mail handlers. *Ibid*. Wembi also said that after he threatened to file an IDHR charge over the reduction in hours, Ziebell told him that the IDHR "does not work for black people." Doc. 40-3 (14 C 10407) at 3. Wembi testified at his deposition that his reduced hours were the only evidence supporting his race discrimination claim and that his only documentary

evidence of the reduction was a single Metro work schedule from one week in November 2012. Doc. 40 (14 C 10407) at ¶¶ 15-16; Doc. 40-6 (14 C 10407).

During the week of November 4, 2012, Wembi, Zaid, and Vargas each worked 5.1 hours, and Tatarevic worked 5.3 hours. Doc. 40 (14 C 10407) at ¶¶ 12-14. Wembi testified at his deposition that after he complained to Ziebell, Ziebell increased his hours, and after he filed the IDHR charge, Ziebell "let [Wembi] work for as many hours [he] want[ed] to." *Id*. at ¶ 19. In November 2012, Wembi averaged 21.68 hours per week, and Tatarevic, Zaid, and Vargas averaged 17.43, 20.13, and 17.95 hours per week, respectively. *Id*. at ¶ 14. For the period between November 4, 2012, and January 6, 2013, Wembi averaged 23.17 hours per week, and Tatarevic, Zaid, and Vargas averaged 17.33, 19.38, and 16.99 hours per week, respectively. *Ibid*. When asked at his deposition for facts supporting his discrimination claim, Wembi said:

> I don't care about your facts. I'm telling you what it is. Discrimination is discrimination. It doesn't matter what you do or didn't [*sic*] do it. It's discrimination to me. … It is facts in my evidence.

*Id*. at ¶ 20. Wembi also stated that in his four years at Metro, he was subject to discrimination only for the month of November 2012. *Id*. at ¶¶ 21a-21b (Metro's Local Rule 56.1(a)(3) statement in Case 14 C 10407 includes two Paragraph 21s.). On January 14, 2014, IDHR dismissed Wembi's discrimination charge for lack of substantial evidence. Doc. 40-14 (14 C 10407). Wembi testified at his deposition that he doesn't "trust" IDHR and that in his "opinion," he doesn't "believe" the result of the IDHR investigation. Doc. 40 (14 C 10407) at ¶ 22.

On December 11, 2013, Wembi filed another discrimination charge with IDHR, alleging that between December 1, 2013, and December 10, 2013, Ziebell, who had not previously commented on Wembi's first IDHR charge, harassed him and retaliated against him for filing that charge. Doc. 40 (14 C 10407) at ¶ 23; Doc. 40-17 (14 C 10407); Doc. 42 (15 C 464) at ¶¶ 8-9; Doc. 42-6 (15 C 464). The second IDHR charge did not allege race or age discrimination.

Doc. 40-17 (14 C 10407); Doc. 42-6 (15 C 464). Rather, it alleged that Ziebell told Wembi that "he [Ziebell] does not care if I have an attorney, or if I file additional charges with [IDHR]; he perceives that I have been disrespectful towards him because I have failed to speak with him about the discrepancies we have between each other," which were related to whether Wembi was entitled to pay for arriving at work when there was no work to be done. Doc. 40 (14 C 10407) at ¶¶ 23, 25; Doc. 42 (15 C 464) at ¶ 8. On August 26, 2014, the IDHR dismissed the second charge for lack of substantial evidence. Doc. 42 (15 C 464) at ¶ 10; Doc. 42-10 (15 C 464).

At the time of Ziebell's alleged harassment, Metro had a company policy prohibiting workplace harassment. Doc. 40 (14 C 10407) at ¶ 27. Ziebell was demoted and fired shortly after the above-described incident, and Ziebell's alleged statements are the sole basis for Wembi's harassment claim. *Id*. at ¶¶ 28-29. Following that incident, Wembi continued to work for Metro without interruption, drew the same level of pay, worked the same schedule (between 23-38 hours per week), and was not disciplined or demoted. *Id*. at ¶¶ 26, 30-31. From December 2012 until his termination in January 2015, no other member of management made any comments about Wembi's IDHR charges. Doc. 42 (15 C 464) at ¶ 9. Wembi's hourly pay rate remained unchanged throughout his entire time of employment at Metro, although Metro's two Local Rule 56.1(a)(3) statements give slightly different accounts of that rate: one says that it was $21.42 per hour, and the other $21.60. Doc. 40 (14 C 10407) at ¶ 3; Doc. 42 (15 C 464) at ¶¶ 2, 6.

On December 29, 2014, Wembi filed Case 14 C 10407. Doc. 9 (14 C 10407). In December 2014, USPS canceled a contract with Metro—the record does not indicate whether it was the same contract that was signed in August 2012—which led to a reduction in Metro's revenue. Doc. 42 (15 C 464) at ¶ 11; Doc. 42-2 (15 C 464) at ¶ 7. As a result, Metro had to

terminate numerous employees. Doc. 42 (15 C 464) at ¶ 12. On January 5, 2015, Metro fired twenty-four workers, including Wembi. *Id.* at ¶ 13. Of the twenty-four terminated employees, four were Caucasian, seven (including Wembi) were African-American, eleven were Hispanic, one was Asian, and one's ethnicity was not identified. *Id.* at ¶ 14; Doc. 42-12 (15 C 464). In addition to several employees whose ethnicity Metro has not verified, Metro retained seventeen Caucasian, twelve African-American, three Hispanic, and four Asian employees. Doc. 42 (15 C 464) at ¶ 14.

Following his firing, Wembi did not file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") or IDHR regarding the termination. *Id.* at ¶ 16. On January 16, 2015, he filed Case 15 C 464. Doc. 9 (15 C 464).

### Discussion

In Case 14 C 10407, Wembi alleges age, color, and race discrimination, as manifested in the November 2012 reduction in his work hours, Ziebell's December 2013 harassment, and Metro's failure to promote him. Doc. 9 (14 C 10407) at 3-4. In Case 15 C 464, Wembi alleges that he was terminated due to his color and also in retaliation for his previous allegations of discrimination. Although the complaint in Case 15 C 464 does not specify whether the retaliation was for Wembi's filing the IDHR charges, for his filing Case 14 C 10407, or for both, "*pro se* pleadings … are to be liberally construed," *Anderson v. Hardman*, 241 F.3d 544, 545 (7th Cir. 2001); *see also Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015) ("Because Perez's complaint is *pro se*, we construe it liberally, holding it to a less stringent standard than formal pleadings drafted by lawyers.") (internal quotation marks omitted), and so the court will assume that the complaint alleges retaliation both for the IDHR charges and for filing 14 C 10407. (The complaint in Case 15 C 464 also alleges discriminatory failure to promote, but that claim is

duplicative of the failure to promote claim in Case 14 C 10407 and thus will not be discussed separately.) Metro seeks summary judgment on all claims. Unless otherwise noted, citations to docket entries in the following sections are to the docket for the case discussed in that section.

## I.    Case 14 C 10407

### A.    Title VII and § 1981 Race and Color Discrimination

"The same requirements for proving discrimination apply to claims under Title VII [and] § 1981," *Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 850 n.7 (7th Cir. 2010), and for ease of exposition, the court will cite only Title VII precedents in addressing Wembi's Title VII and § 1981 race and color discrimination claims. A Title VII race discrimination plaintiff may seek to defeat summary judgment under the direct or indirect methods of proof. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016); *Carothers v. Cook Cnty.*, 808 F.3d 1140, 1148-49 (7th Cir. 2015).

"Under the 'direct method,' the plaintiff may avoid summary judgment by presenting sufficient evidence, either direct or circumstantial, that the employer's discriminatory animus motivated an adverse employment action." *Harper v. Fulton Cnty.*, 748 F.3d 761, 765 (7th Cir. 2014) (internal quotation marks omitted); *see also Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). The appropriate focus under the direct method "is not whether the evidence offered is direct or circumstantial but rather whether the evidence points directly to a discriminatory reason for the employer's action." *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008) (internal quotation marks omitted); *see also Morgan v. SVT, LLC*, 724 F.3d 990, 997 (7th Cir. 2013) ("The plaintiff's task in opposing a motion for summary judgment is straightforward: he must produce enough evidence, whether direct or circumstantial, to permit the trier of fact to find that his employer took an adverse action against him because of his race."); *Everett v. Cook Cnty.*,

655 F.3d 723, 729 (7th Cir. 2011); *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 672 (7th Cir. 2011).

"Direct evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption. In short, [d]irect evidence essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (alteration in original) (citations and internal quotation marks omitted); *see also Roberts v. Columbia Coll. Chi.*, 821 F.3d 855, 865 (7th Cir. 2016); *Harper*, 748 F.3d at 765; *Morgan*, 724 F.3d at 995; *Coleman*, 667 F.3d at 860; *Everett*, 655 F.3d at 729. The record unsurprisingly includes no direct evidence that Metro discriminated against Wembi due to his race or color.

"A plaintiff can also prevail under the direct method of proof by constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker. That circumstantial evidence, however, must point directly to a discriminatory reason for the employer's action." *Rhodes*, 359 F.3d at 504 (citations and internal quotation marks omitted); *see also Roberts*, 821 F.3d at 865; *Carothers*, 808 F.3d at 1149; *Chaib v. Indiana*, 744 F.3d 974, 982 (7th Cir. 2014); *Perez v. Thorntons, Inc.*, 731 F.3d 699, 710-11 (7th Cir. 2013); *Morgan*, 724 F.3d at 995-96; *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1105 (7th Cir. 2012); *Everett*, 655 F.3d at 729 (explaining that circumstantial evidence is "evidence that points to discriminatory animus through a longer chain of inferences"). Circumstantial evidence typically falls into one of three categories: "(1) suspicious timing, ambiguous statements (oral or written) or behavior toward, or comments directed at, other employees in the protected group; (2) evidence, whether or not rigorously

statistical, that similarly-situated employees outside the protected class received systematically better treatment; or (3) evidence that the employer offered a pretextual reason for an adverse employment action." *Boss v. Castro*, 816 F.3d 910, 916-17 (7th Cir. 2016); *see also Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 790 (7th Cir. 2015); *Chaib v. Indiana*, 744 F.3d at 982; *Perez*, 731 F.3d at 711; *Morgan*, 724 F.3d at 995-96; *Coleman*, 667 F.3d at 860; *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011); *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011). To overcome summary judgment, circumstantial evidence need not "combine to form a tidy, coherent picture of discrimination, in the same way the tiles of a mosaic come together to form a tidy, coherent image, in order for a plaintiff to survive summary judgment." *Morgan*, 724 F.3d at 997. Rather, "[i]f the plaintiff can assemble from various scraps of circumstantial evidence enough to allow the trier of fact to conclude that it is more likely than not that discrimination lay behind the adverse action, then summary judgment for the defendant is not appropriate, and the plaintiff may prevail at trial even without producing any 'direct' proof." *Id.* at 996; *see also Greengrass v. Int'l Monetary Sys.*, 776 F.3d 481, 486 (7th Cir. 2015); *Muhammad v. Caterpillar, Inc.*, 767 F.3d 694, 700 (7th Cir. 2014).

A plaintiff who cannot forestall summary judgment under the direct method may rely on the indirect method articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). The indirect method has three steps. First, the plaintiff must "make a prima facie showing that (1) she is a member of a protected class; (2) she met her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class received more favorable treatment." *Kuttner v. Zaruba*, 819 F.3d 970, 976 (7th Cir. 2016) (internal quotation marks omitted); *see also Coleman*, 667 F.3d at 845. Second, if the plaintiff makes out a *prima facie* case, "[t]he burden … shift[s] to the

employer to articulate some legitimate, nondiscriminatory reason" for its action. *Ibid*. (internal

quotation marks omitted). Third, if the defendant articulates a legitimate, non-discriminatory

reason, the burden shifts back to the plaintiff, who must provide evidence that the defendant's

stated reason is pretextual. *Ibid*.

### 1. November 2012 Reduction in Hours

Wembi first alleges that he was guaranteed a morning shift and "40+ Hours" of work per

week, but that Metro violated this guarantee when it drastically reduced his hours for the pay

period ending on November 4, 2012. Doc. 47 at 14. He maintains that although Metro attributed

the reduction in hours to a loss of revenue, non-African-American employees Zaid, Tatarevic,

and Vargas were hired for the same position and worked more hours than he did during this

period. *Id*. at 38. Wembi offers no evidence that supports these assertions.

During the pay period in question, Zaid and Vargas worked precisely the same number of

hours (5.1) as Wembi, and Tatarevic worked only 0.2 hours (twelve minutes) more. Doc. 40 at

¶¶ 12-14. Wembi concedes that after he complained about the reduced hours, Ziebell increased

his hours, and that, after Wembi filed his IDHR charge, Ziebell allowed him to work as many

hours as he wanted. *Id*. at ¶ 18. Indeed, over the next two months, Wembi averaged more than

twenty-five hours per week, more than Zaid, Tatarevic, or Vargas. *Id*. at ¶ 14. Wembi also has

not adduced any evidence that supports the notion that he was guaranteed forty hours of work per

week. He therefore "provides no evidence, statistical or otherwise, to corroborate his belief" that

he suffered anything other than a reduction in work hours that applied to all Metro employees

that he identifies as comparators. *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1116 (7th Cir.

2009). Because Wembi does not allege suspicious timing or pretext, he cannot prevail under the

direct method; and because he has not shown that similarly situated employees received more favorable treatment, he cannot prevail under the indirect method.

An independent ground for summary judgment is that Wembi has not demonstrated that he suffered an adverse employment action. Adverse actions may include:

> (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment.

*Dass v. Chi. Bd. of Educ.*, 675 F.3d 1060, 1069 (7th Cir. 2012) (internal quotation marks omitted). "To rise to the level of an adverse action, a change must be one that a reasonable employee would find to be materially adverse." *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 889 (7th Cir. 2016) (internal quotation marks omitted). "This means that the action must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Porter v. City of Chicago*, 700 F.3d 944, 954 (7th Cir. 2012). In other words, "an adverse action must materially alter the terms of conditions of employment to be actionable." *Ibid*.

Wembi believes that Metro doctored his and his comparators' timesheets for purposes of this litigation. Doc. 47 at 38. But Wembi adduces no evidence that Metro actually did so, no evidence that contradicts Metro's timesheets, and no evidence creating a genuine factual dispute about Wembi's reduction in hours. Wembi also offers no evidence about the number of hours that he typically worked prior to the pay period ending November 4, 2012. He offers only an illegible schedule for a single unspecified week in November 2012, Doc. 40-6, but adduces no

evidence that this schedule reflected the hours that the employees actually worked, or that, even if they did, they represented a reduction in hours to which Wembi was uniquely subject. Wembi suffered no change in his pay rate, employment status, or working conditions, and he was not subject to any action beyond the alleged reduction in hours, for which he has no evidence. He therefore suffered no adverse action under the governing standard.

For these reasons, Metro is entitled to summary judgment on his discrimination claims relating to the November 2012 events.

### 2. December 2013 Harassment and Retaliation

Wembi next contends that his alleged harassment by Ziebell in December 2013 constituted an adverse action, both as retaliation (for filing his first IDHR charge in December 2012) and by creating a hostile work environment. A hostile work environment claim qualifies as a materially adverse employment action. *See Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 745 (7th Cir. 2002) (holding that materially adverse employment actions include "cases of harassment-mistreatment of an employee by coworkers or supervisors that is sufficiently severe to worsen substantially his conditions of employment as they would be perceived by a reasonable person in the position of the employee") (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 786-88 (1998)). "Surviving summary judgment on a hostile work environment claim requires sufficient evidence demonstrating (1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class or in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Boss*, 816 F.3d at 920.

The third element of a hostile work environment claim "is in the disjunctive—the conduct must be *either* severe *or* pervasive." *Vance v. Ball State Univ.*, 646 F.3d 461, 469 (7th

Cir. 2011), *aff'd*, 133 S. Ct. 2434 (2013). This means that "one extremely serious act of harassment could rise to an actionable level[,] as could a series of less severe acts." *Hall v. City of Chicago*, 713 F.3d 325, 330 (7th Cir. 2013). A court addressing this element must consider "factors like the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance." *Boss*, 816 F.3d at 920. In so doing, the court must bear in mind that Title VII does not impose a "general civility code" in the workplace and that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (citation and internal quotation marks omitted); *see also McPherson v. City of Waukegan*, 379 F.3d 430, 438-39 (7th Cir. 2004). A workplace rises to the level of an objectively hostile work environment only if it is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014).

Wembi has not adduced evidence sufficient to support his claim that Ziebell created a hostile work environment. Wembi contends that Ziebell harassed him "by indicating that he does not care if [Wembi has] an attorney, or … file[s] additional charges with" IDHR. Doc. 40-17 at 2. Although Wembi's second IDHR charge indicates that the harassment occurred from December 1 to December 10, 2013, *id.* at 1, he has not shown that it was severe or pervasive throughout this period or that any of Ziebell's actions qualifies as an "extremely serious act of harassment." *Hall*, 713 F.3d at 330. There is no evidence that Wembi's and Ziebell's interactions occurred with such regularity that they altered the terms and conditions of his

employment. Nor does the record indicate that they interfered at all, much less unreasonably so, with Wembi's work performance. *See Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005) (affirming a grant of summary judgment for the defendant on a hostile work environment claim, in part because the plaintiff offered no proof that she "was unable to perform her job because of the conduct of her supervisors and co-workers"). To the contrary, following the incident, Wembi's duties, pay, and hours remained the same; he was not disciplined, demoted, or suspended; and he remained at Metro without incident or complaint for more than a year. Accordingly, because the acts of which Wembi complains are not objectively severe or pervasive, they cannot support a hostile work environment claim.

With no hostile work environment claim, Wembi has no materially adverse employment action, which means that he also has no viable Title VII retaliation claim either. As with other Title VII discrimination claims, Wembi may defend the retaliation claim under either the direct or indirect methods. *See Boss*, 816 F.3d at 918. To forestall summary judgment under the direct method, Wembi "must show that (1) he engaged in protected activity; (2) he suffered a materially adverse employment action; and (3) there was a causal link between the protected activity and the adverse action." *Ibid.* "To prove retaliation under the indirect method, a plaintiff must show that (1) he engaged in protected activity; (2) he suffered a materially adverse employment action; (3) he was meeting his employer's legitimate expectations; and (4) he was treated less favorably than similarly-situated employees who did not engage in protected activity." *Ibid.* Because both methods require that Wembi have suffered an adverse employment action, and because he did not, summary judgment is granted on the retaliation claim in Case 14 C 10407.

### 3. Failure to Promote

The complaint alleges that Metro failed to promote Wembi due to his race and color. Doc. 9 at 4. Although Metro's motion purports to seek "summary judgment as to all claims contained in" the complaint, Doc. 38 at 1, its briefs do not mention the failure to promote claim. Accordingly, Metro has forfeited the point. *See G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court. That is true whether it is an affirmative argument in support of a motion to dismiss or an argument establishing that dismissal is inappropriate.") (citations omitted); *Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011) ("As the moving party, the [defendant] had the initial burden of identifying the basis for seeking summary judgment."); *Titran v. Ackman*, 893 F.2d 145, 148 (7th Cir. 1990) ("When a party moves for summary judgment on ground A, the opposing party need not address grounds B, C, and so on."). Summary judgment is therefore denied on the failure to promote claim.

### B. Age Discrimination

In addition to race and color discrimination, the complaint in Case 14 C 10407 alleges that Metro discriminated against Wembi on account of his age in violation of the ADEA. Doc. 9 at 4. Metro contends that Wembi failed to exhaust his administrative remedies, as neither of his IDHR charges alleged age discrimination. Doc. 39 at 10.

"In order to bring an ADEA claim in federal court, a plaintiff must first have raised it in a timely EEOC charge." *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 527 (7th Cir. 2003); *see also* 29 U.S.C. § 626(d)(1) ("No civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the [EEOC]."); *Miller v. Am. Airlines, Inc.*, 525 F.3d 520, 525 (7th Cir. 2008) ("A plaintiff generally

cannot bring a claim in an ADEA lawsuit that was not alleged in the EEOC charge."); *Vela v. Vill. of Sauk Vill.*, 218 F.3d 661, 663-64 (7th Cir. 2000). Because "IDHR automatically cross-files with the EEOC a charge that alleges employment discrimination prohibited by federal law," IDHR charges suffice for the exhaustion requirement. *Gray-Brock v. Ill. Am. Water Co.*, 609 F. App'x 867, 868 n.1 (7th Cir. 2015). The exhaustion rule "serves the dual purpose of affording the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion, and of giving the employe[r] some warning of the conduct about which the employee is aggrieved …. For allowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would frustrate the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge." *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994) (citation omitted). "For a plaintiff to proceed on a claim not raised in an EEOC charge, there must be a reasonable relationship between the allegations in the charge and the claims in the complaint, and it must appear that the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge." *Jones v. Res-Care, Inc.*, 613 F.3d 665, 670 (7th Cir. 2010) (quoting *Vela*, 218 F.3d at 664) (internal quotation marks omitted). Such claims must be "like or reasonably related to the administrative charges." *Reynolds v. Tangherlini*, 737 F.3d 1093, 1102 (7th Cir. 2013) (internal quotation marks omitted).

Wembi's IDHR charges do not explicitly allege age discrimination. Doc. 40-4; Doc. 40-17. The dispositive question, then, is whether the claims explicitly set forth in the IDHR charges are "like or reasonably related" to the age-based claim set forth in the complaint, such that the age-based claim can reasonably have been expected to grow out of an EEOC investigation into the allegations in the IDHR charges. Wembi's first IDHR charge alleges only a "reduction in

hours … because of [his] race, black," and contains only two "prima facie allegations": "1. My race is black" and "2. My job performance as mail handler meets [Metro's] expectations, I was hired on November 16, 2011." Doc. 40-4 at 1. Wembi's second IDHR charge alleges only "[h]arassment, beginning on or about December 1, 2013 and continuing through the present (December 10, 2013), in retaliation for filing a previous charge of discrimination against [Metro]." Doc. 40-17 at 1. It contains four allegations, none of which mention age discrimination or Wembi's age. *Id*. at 1-2.

Although "[c]ourts review the scope of an EEOC charge liberally," *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cnty.*, 804 F.3d 826, 831 (7th Cir. 2015), the factual allegations in Wembi's charges are insufficient to satisfy the "like or reasonably related" standard for purposes of his age discrimination claim. "There is nothing about [Wembi's IDHR] charge[s] that would reasonably lead one to conclude that Wembi was a victim of age discrimination." *Ajayi*, 336 F.3d at 527. Wembi

> doesn't mention age anywhere in the charge. The date-of-birth field on the charge form [in both complaints] is left blank, the age-discrimination box is unchecked, and, in describing the charge[s], [he] doesn't specify the ages of other employees who allegedly received more favorable treatment … nor any other facts that might have alerted the [IDHR] to the claim.

*Ibid*. Because it is impossible to infer from Wembi's charge that his age played any role in Metro's allegedly discriminatory or retaliatory conduct, his ADEA claim is not like or reasonably related to the allegations in his IDHR charges. *See Moore v. Vital Prods., Inc.*, 641 F.3d 253, 257 (7th Cir. 2011) ("At best, the EEOC charge can be read to allege a hostile work environment and retaliation …. These harassment and retaliation allegations are not like or reasonably related to Moore's discriminatory discharge claim."); *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 270 (7th Cir. 2004) (holding that allegations of "unequal pay or a hostile work environment" were not reasonably related to an EEOC charge that alleged failure to

promote "on account of … race and gender"); *Fairchild v. Forma Sci., Inc.*, 147 F.3d 567, 575-76 (7th Cir. 1998) (holding that the allegations in the plaintiff's EEOC charge were not reasonably related to the ADA disability discrimination claim in his federal complaint because "[the plaintiff] did not support his charge with specific facts" and "made factual allegations that could only support one kind of discrimination–discrimination based on age"); *Cheek v. Peabody Coal Co.*, 97 F.3d 200, 202-03 (7th Cir. 1996) ("The allegations in Cheek's EEOC complaint, which asserted only disparate treatment and did not in any way advert to sexual harassment, are completely unrelated to those that underlie her harassment charges .… Not having raised the [harassment] claim or even its seeds before the EEOC, Cheek was not entitled to bring it in her Title VII action."); *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1111 (7th Cir. 1992) (holding that "the racial harassment claims [in the federal complaint] were never properly presented to the EEOC" because the plaintiff's EEOC charge did not contain specific facts supporting a race discrimination claim). Therefore, Wembi's ADEA claim was not exhausted, and Metro is entitled to summary judgment on that claim.

## II.  Case 15 C 464

The complaint in Case 15 C 464 states claims for discriminatory and retaliatory termination. Doc. 9 at 3-4. Wembi may defeat summary judgment on these claims under either the direct or indirect methods.

With regard to the *discriminatory* termination claim, Wembi has not adduced sufficient evidence under either method. Although, as discussed below, the timing of his termination was suspicious, nothing about that suspicious timing "points directly to a discriminatory reason"—as opposed to a *retaliatory* reason—for his firing. *Carothers*, 808 F.3d at 1149 (internal quotation marks omitted). The only arguably ambiguous statement about race or color was Ziebell's

December 2012 comment about IDHR "not work[ing] for black people," but Ziebell was discharged over a year before Wembi's termination, and there is no evidence that anybody with decisionmaking authority over Wembi's employment bore animus against him on the basis of his race or color.

Wembi also identifies no similarly situated employees who were treated differently, as he does not present any possible comparators. As a general rule, a plaintiff must show that a comparator "(1) dealt with the same supervisor, (2) was subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish his conduct or the employer's treatment of him." *Orton-Bell v. Indiana*, 759 F.3d 768, 777 (7th Cir. 2014) (alterations and internal quotation marks omitted). Wembi points to no individuals to whom he would be properly compared and who were not terminated. Although Wembi contends that "[a]ll of those who were fired were called back except" for Wembi, Doc. 47 at 4 (14 C 10407), he adduces no evidence to support that assertion. Further, as Metro argues, Doc. 41 at 6, Wembi was terminated along with twenty-three other employees of varying races and ethnicities (at least six of whom were African-American), and Metro retained employees of various races and ethnicities (including at least twelve African-Americans). Finally, Metro has adduced evidence that it needed to reduce the size of its workforce following its loss of the USPS contract, Doc. 42 at ¶ 11, and Wembi has not adduced evidence that this reason was a pretext to disguise racial animus. Accordingly, he cannot forestall summary judgment on the discriminatory termination claim under the direct method.

As for the indirect method, Metro concedes that Wembi was a member of a protected category and met Metro's legitimate expectations, and that his termination was an adverse employment action. Doc. 41 at 7-9. And although Metro contends that no employee similarly

situated to Wembi was retained, because "there is absolutely no proof of any Caucasian employee who asserted rights under Title VII or … 42 U.S.C. § 1981 who was retained," *id*. at 9, similarly situated employees need not be "clones." *Coleman*, 667 F.3d at 846 (internal quotation marks omitted); *see Sweatt v. Union Pac. R.R. Co.*, 796 F.3d 701, 709 (7th Cir. 2015). As Metro concedes, many employees were retained when Wembi was terminated. Some of those retained employees were not African-American. That is sufficient for Wembi to make a prima facie case under the indirect method, shifting the burden to Metro. *See Coleman*, 667 F.3d at 845.

As noted above, however, Metro has articulated a legitimate, nondiscriminatory reason for Wembi's termination: it needed to reduce its workforce following the loss of the USPS contract. Doc. 42 at ¶ 11. This shifts the burden back to Wembi to show that Metro's reason is pretextual. *See Coleman*, 667 F.3d at 845. But Wembi has not "present[ed] evidence that … permits an inference of unlawful discrimination." *Ibid*. Although some non-African-American employees were retained, others were let go, and Wembi adduces no evidence to suggest that discriminatory (as opposed to retaliatory) animus motivated his termination. Accordingly, he cannot meet his burden under the indirect method on the discriminatory termination claim, and Metro is entitled to summary judgment on that claim.

Metro is not entitled to summary judgment on Wembi's *retaliatory* termination claim. To survive summary judgment under the direct method, Wembi "must show that (1) he engaged in protected activity; (2) he suffered a materially adverse employment action; and (3) there was a causal link between the protected activity and the adverse action." *Boss*, 816 F.3d at 918. Metro concedes the first two elements, but contends that "there is no evidence of a causal connection between [Wembi's] assertion of right and his layoff." Doc. 41 at 7-8.

Metro is correct as to the IDHR charges. Wembi's sole proposed causal link between the IDHR charges (the second of which was filed in December 2013) and his termination (nearly thirteen months later, in January 2015) is the timing, but the Seventh Circuit has repeatedly held that gaps of that length, or even much shorter, do not alone "create a triable issue on causation." *Hnin v. TOA USA*, 751 F.3d 499, 508 (7th Cir. 2014) (twelve months); *see Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 (7th Cir. 2014) (five months); *Kidwell v. Eisenhauer*, 679 F.3d 957, 967 (7th Cir. 2012) (five weeks for one incident and two months for another); *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 390 (7th Cir. 2012) (six months for one incident and two months for another); *Porter*, 700 F.3d at 957-58 (eleven months); *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) (seven weeks); *Healy v. City of Chicago*, 450 F.3d 732, 741 n.11 (7th Cir. 2006) (more than one year); *Wallscetti v. Fox*, 258 F.3d 662, 669 (7th Cir. 2001) (four or five months).

Nor can Wembi prove retaliation under the indirect method for his IDHR charges, because to do so he must show, among other things, that "he was treated less favorably than similarly-situated employees who did not engage in protected activity." *Boss*, 816 F.3d at 918. Wembi has not adduced evidence that any retained employee had not filed an IDHR charge or otherwise complained about discrimination, so he cannot make a prima facie case. And even if Wembi had shown that similarly situated employees who did not engage in protected activity had been retained, his claim still would fail under the indirect method for the same reason it fails under the direct method: the gap in time between his December 2013 IDHR charge and his January 2015 termination is too long to allow a jury to infer that Metro's reason for its termination (the need for layoffs due to a loss of a major contract) was a pretext for retaliating against him for the IDHR charge.

However, Wembi can forestall summary judgment on his retaliatory termination claim as it pertains to his filing of Case 14 C 10407. Wembi filed Case 14 C 10407 on December 29, 2014. Metro fired him a week later, on January 5, 2015, allegedly because the December 2014 cancellation of its contract with USPS reduced its revenue and compelled a reduction in its workforce. Doc. 42 at ¶¶ 11-12; Doc. 42-2 at ¶ 7. Even assuming that the cancellation of the USPS contract justified the termination of *some* employees, Metro does not explain *how* it decided *which* employees to terminate. According to an affidavit from Joseph Cruz, who made the termination decisions, the "only consideration in making these [termination] decisions was to best serve the needs of [Metro's] remaining customers." *Id*. at ¶ 8. But this provides no information about why Wembi—an employee who during more than three years at Metro was never disciplined, suspended, or demoted, and whom Metro concedes was meeting its expectations—was one of the twenty-four employees who was terminated. In the absence of such information, a reasonable jury could find that Wembi was terminated for bringing Case 14 C 10407 against Metro.

Metro retorts that "[u]nder most circumstances, suspicious timing alone does not create a triable issue on causation." Doc. 41 at 8 (quoting *Hnin*, 751 F.3d at 508). But "adverse actions occasionally come so close on the heels of a protected act that an inference of causation is sensible," *Benuzzi v. Bd. of Educ. of Chi.*, 647 F.3d 652, 665 (7th Cir. 2011) (internal quotation marks omitted); *see also Milligan*, 686 F.3d at 389 ("In egregious cases, suspicious timing alone might create a triable issue on causation."), and this is one of those cases. Wembi was terminated only seven days after filing a federal lawsuit alleging race discrimination. That is hardly enough time for the "inference of causation [to] weaken[]" due to "time between the protected expression and the adverse action," *Carlson*, 758 F.3d at 828; *see also Loudermilk v.*

26

*Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011) ("The closer two events are, the more likely the first caused the second."), particularly in the absence of any other evidence or even a proffered explanation as to why Wembi in particular (as opposed to other Metro employees) was fired. The seven-day time period—which included only four business days—between protected activity and retaliatory action is also far shorter than nearly all of those periods that, as noted above, the Seventh Circuit has held do not support causal inferences, and more akin to those which it has, *see Loudermilk*, 636 F.3d at 314 (one day); *Casna v. City of Loves Park*, 574 F.3d 420, 423 (7th Cir. 2009) (four "business days"); *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 549 (7th Cir. 2008) (allowing that "matters occurring within … weeks of each other" could satisfy the causation element); *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 786-87 (7th Cir. 2007) (protected activity in "late February or early March" and retaliation on March 3); *Spiegla v. Hull*, 371 F.3d 928, 943 (7th Cir. 2004) ("just four days (including the weekend) … [that] came after seven years of uninterrupted postings"); *McClendon v. Ind. Sugars, Inc.*, 108 F.3d 789, 797 (7th Cir. 1997) (collecting cases and noting that "[w]e have found the causal nexus sufficiently demonstrated when the time period between the filing of a complaint and the adverse action was … one week"); *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1312, 1314-15 (7th Cir. 1989) (one week). The January 5, 2015 termination was close enough to the December 29, 2014 filing to allow a reasonable jury to find that retaliatory animus motivated Wembi's termination.

Metro contends that summary judgment must nevertheless be granted on the retaliatory termination claim because Wembi failed to exhaust his administrative remedies. Doc. 41 at 9. In so contending, however, Metro fails to acknowledge, let alone distinguish, an exception to the exhaustion requirement for situations where an employee complains about retaliation for filing a

previous discrimination claim.  *See Smith v. Shinseki*, 2013 WL 3466841, at *9-10 (N.D. Ill. July 10, 2013) (collecting cases and explaining the principle).  The exception indisputably applies to situations where an employer allegedly retaliates against an employee for filing an EEOC charge. *See Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1030 (7th Cir. 2013) ("[F]or practical reasons, to avoid futile procedural technicalities and endless loops of charge/retaliation/charge/retaliation, etc. … a plaintiff who alleges retaliation for having filed a charge with the EEOC need not file a second EEOC charge to sue for that retaliation."); *Horton v. Jackson Cnty. Bd. of Cnty. Comm'rs*, 343 F.3d 897, 898 (7th Cir. 2003) ("Retaliation for complaining to the EEOC need not be charged separately from the discrimination that gave rise to the complaint, at least … if the person discriminated against and the person retaliated against are the same.") (citations omitted).  The exception also has been held to apply to retaliation for filing a federal lawsuit following an administrative charge.  *See McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 482 (7th Cir. 1996) (approvingly citing *Kirkland v. Buffalo Board of Education*, 622 F.2d 1066 (2d Cir. 1980), for its holding that an "act of retaliation was 'directly related' to plaintiff's initiation of litigation and that no second EEOC charge was necessary"); *Muwonge v. Eisenberg*, 2008 WL 753898, at *13 & n.8 (E.D. Wis. Mar. 19, 2008) ("[O]ne of the purposes of the exhaustion rule is to provide the EEOC and the employer an opportunity to settle the grievance without resort to the courts.  However, this case was already pending in federal court when the plaintiff amended his complaint to include a claim for retaliation.  Given that the claim for retaliation relates to the filing of this suit, it was not possible for such claim to have been included in the original EEOC charge.  The ADA … does not require exhaustion of a claim for retaliation for filing this suit, which filing occurred subsequent to the filing of the EEOC charge for disability discrimination.").

The court acknowledges that the Seventh Circuit, despite its favorably citing *Kirkland* in *McKenzie*, has not expressly addressed whether the exception to the exhaustion requirement applies to retaliation for filing a lawsuit as opposed to an EEOC charge. But Metro, not having acknowledged the exception, does not explain why it should apply in the latter circumstance but not the former. Metro's position on the point accordingly is forfeited for purposes of summary judgment. *See Rahn v. Bd. of Trs. of N. Ill. Univ.*, 803 F.3d 285, 295 (7th Cir. 2015) (holding that litigants "waive[] any claim" where "they have failed to cite any legal authority in support of [their] argument"); *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 833 (7th Cir. 2014) ("[A]s the district court found, the musical diversity argument was forfeited because it was perfunctory and underdeveloped."); *cf. Fluker v. Cnty. of Kankakee*, 741 F.3d 787, 792 (7th Cir. 2013) ("[F]ailure to exhaust administrative remedies does not deprive a court of jurisdiction. A district court can therefore decide a suit on the merits if a defendant does not raise failure to exhaust as an affirmative defense, even if the defense could have been asserted.") (citation and internal quotation marks omitted). It follows that summary judgment is denied.

## Conclusion

For these reasons, Metro's summary judgment motions are granted in part and denied in part. The motion is granted as to all claims except for the failure to promote claim in Case 14 C 10407 and the retaliatory termination claim in Case 15 C 464 as it pertains to the filing of Case 14 C 10407. The surviving claims will proceed to trial.

July 18, 2016

_____
United States District Judge